[*General Term, April,* 1873.]

JAMES P. KILBRETH ET AL., TRUSTEES OF THE OHIO LIFE IN-
SURANCE AND TRUST COMPANY *v.* JOSEPH F. DISS ET AL.

A judgment rendered by the Superior Court of Cincinnati is not a lien
upon all the judgment debtor's lands lying within the county of
Hamilton, but only such as are within the city of Cincinnati. *Good-
man* v. *McCall,* 2 Cin. Sup. Ct. Rep. 159, overruled.

*Wm. Disney,* in support of the lien.

*C. D. Coffin,* and *Stevenson & Maxwell,* contra.

YAPLE, J.    This case is reserved from Special Term, for decision here, upon the single question, whether a judgment rendered by this court, in the year 1855, became a lien, without the levy of an execution, upon all the judgment debtor's lands in Hamilton county, as well as in the city of Cincinnati.

*The Superior Court of Cincinnati* was created by the legislature of the state, by an act passed April 7, 1854 (1 S. & C. 388, etc.), and was the only court of general jurisdiction ever previously known, or existing in the state, whose territorial jurisdiction over real estate was not co-extensive with the county. Its primary jurisdiction was and is limited to the city of Cincinnati. Section 14 confers upon it, among other things, " original jurisdiction to hear, try,

and determine the following actions: 1. Actions for the recovery of real property, or of an estate, or interest therein; for the partition of real property; for the sale of real property under a mortgage, *lien,* or other charge or incumbrance, *when the subject of the action shall be situated within the city of Cincinnati.*"

By the act of February 10, 1857 (1 S. & C. 391), the jurisdiction of the court was extended to actions, etc., as follows: " 1. Actions in the nature of creditors' bills *in aid of execution* brought by a judgment creditor, *who has obtained a judgment in the said court,* to subject any interest of the judgment debtor in lands situate in Hamilton county, to the payment of such judgment."

The law at that time (see Code, secs. 458–476) required the issuing of an execution before a judgment plaintiff could resort to such proceedings as are authorized by this act of 1857; and it will be seen hereafter that this court has always had the power to issue executions upon its judgments to any county, which can be levied upon the judgment debtor's lands anywhere within the state. Code, secs. 421, 454.

Section 20 of the act establishing this court is as follows: " All laws *now in force,* or which may hereafter be enacted, conferring jurisdiction, in the actions above enumerated, upon the courts of common pleas or district courts, giving them power to hear and determine such cases, and . . . prescribing the *force* and *effect* of their judgments, orders, or decrees, and authorizing or directing the execution thereof, shall be held and deemed to extend to the said Superior Court of Cincinnati, as fully as they extend to the said courts of common pleas and district courts, *unless the same be inconsistent with this act, or plainly inapplicable,* . . . and the said Superior Court of Cincinnati, in respect to . . . the force and effect of its judgments, orders, and decrees, shall be deemed and held a court of general jurisdiction," etc.

This section does not profess to enlarge the *territorial*

*area* of the court's jurisdiction, which is prescribed and limited by section 14. Within the limits specified in that section, all laws then, or thereafter to be in force, governing courts of common pleas and district courts, are made applicable to this court, except such as are inconsistent with the act establishing the court, or are plainly inapplicable.

The civil code was passed March 11th, and took effect June 1, 1853, *before* the creation of this court, and when there was no court of general jurisdiction in Ohio—as there never previously had been—limited in its territorial jurisdiction to only a portion of a county.

Section 421 of the code provides: " The lands and tenements of the debtor within the *county* where the judgment is entered, shall be bound for the satisfaction thereof, from the first day of the term at which judgment is rendered, etc. . . . And all other lands, as well as goods and chattels of the debtor, shall be bound from the time they are seized in execution."

An act was passed January 10, 1853 (1 S. & C. 385), *before* the creation of this court, making judgments rendered by the Supreme Court of the state, liens upon the debtor's lands which lie within the *county* where the suit originated, and the other lands, etc., of the debtor only from the time of their seizure upon execution.

The acts of February 19, 1852 (1 S. & C. 381, sec. 13), and of March 14, 1853 (1 S. & C. 583, sec. 20), made, substantially, the same provision in relation to the judgments of district courts. As the jurisdiction of the Supreme Court extends over the entire state, and that of a district court over several counties, these provisions in relation to such courts are plainly *restrictive*, not *enlarging* in their nature.

A transcript (S. & S. 567; 2 S. & C. 1093, sec. 490) of the judgment of a justice of the peace not being appealed from, may, after ten days from the rendition of judgment, be filed in the clerk's office of the county, and the amount thereof entered on the execution docket and become a lien

upon the debtor's real estate from the day of filing, etc. The statute does not say *upon lands within the county,* but such is its obvious construction. This is a substitute for the old proceeding by *scire facias* given as in Swan's Stat. 1841, p. 521, secs. 87–89, authorizing the judgment creditor, after the return of an execution unsatisfied, to suggest to the justice the possession of lands by the debtor, and then to take a transcript, file it with the clerk of the court of common pleas, cause a writ of *scire facias* to issue returnable to the next term, and thus procure the award of execution against the lands of the debtor. The present law is much more convenient and less expensive than the former one. Is, then, the term "county," in its *literal* sense, inconsistent with the acts establishing this court, or plainly inapplicable when applied as defining and limiting the territorial extent of the *lien* upon lands attaching to and resulting from its judgments? We are unanimous in answering both these questions in the affirmative. We are not able to perceive why or how this court can acquire jurisdiction, as an *incident,* over a subject matter which is denied it directly and primarily. The original section 14, above quoted, forbids the direct enforcement by this court of a lien upon lands not situated within the city of Cincinnati; and the amendatory act of 1857 does not aid it, except an execution be issued; and an execution may be issued upon a judgment of the court to any county in the state. To assume that such amendatory act was passed *because* there was such *lien,* and that it could not be enforced fully without such legislation, is to beg the whole question. The term "*county,*" as applied to the territorial extent of the liens of judgments rendered in this court, is plainly inapplicable.

The uniform construction by all courts in this country, both state and federal, with the exception of a single decided case hereafter to be noticed, has been to *limit* the liens of their judgments upon lands to those lying within the limits of their territorial jurisdiction, though their

process might be capable of being executed (as the levy of an execution) beyond. In this state, the act of January 19, 1802 (1 Chase's Stat. 316, sec. 2), provided: "That the lands, etc., of the defendant shall be bound and liable to the satisfaction of the judgment from the first day of the term in which such judgment is obtained."

It did not say "within the county," as the act of 1820 and subsequent acts have said, and there were then but eleven counties in the state.

In *Roads* v. *Symmes*, 1 Ohio, 313, the Supreme Court say: "It is equally well settled that this lien is *co-extensive with the territorial jurisdiction of the court that renders the judgment.* The general court of the territory exercised jurisdiction and sent its process, original and final, into any county within the territory. The judgments rendered by it were, of consequence, a lien or charge upon all the lands owned by the defendant, and situate anywhere in the territory." This has always been the settled rule of law in Ohio.

Congress never enacted any law creating liens upon lands by judgments rendered in any of the federal courts. But the practice act of 1789 (1 Stat. at Large, 73, sec. 34) provided that, "The laws of the several states, except where the constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States *in cases where they apply.*"

It was under this act that it was held that judgments of the circuit courts of the United States were liens upon the lands of the debtor in states where judgments of the state courts were liens, but not otherwise. But such judgments were held to be a lien upon all the debtor's lands lying within the district where rendered, just as within the "*county*" when rendered by a state court. And when a state was divided into more districts than one, the lien of a judgment thereafter rendered in the circuit court of any such district, was limited to lands lying within it. This

never was effected by legislation, but only by construction; for there is no legislation creating or defining such liens, though several subsequent acts of Congress speak of them as a thing that exists. In 1828 (4 Stat. at Large, 278), Congress more fully adopted the laws and usages of the states as applicable to the federal courts. Our lien law then in force was the act of February 24, 1820 (2 Chase, 1144, sec. 2), making judgments a lien from the first day of the term "*in all cases where such lands lie within the county,*" etc.

This was the first instance, in this state, of the use of the restrictive word "*county.*" Yet, in *Sellers* v. *Corwin*, 5 Ohio, 400, the Supreme Court decided that a judgment rendered by the United States Circuit Court, for the then district of Ohio, was a lien upon all the debtor's lands within the *state*, and quoted and approved the language of *Roads* v. *Symmes*. The lien was not limited to the *county of Franklin* where the judgment was rendered. Since the state subsequently became divided into two districts. Judgments rendered by the circuit courts within them have only been a lien upon the debtor's land lying in the district. The rule is settled by the United States courts as well as by the Supreme Court of Ohio. The federal law is well stated, and many of the cases referred to in 2 Abb. U. S. Prac. 148, 149. And see *Williams* v. *Benedict*, 8 How. 107; *Cropsey* v. *Crandall*, 2 Bl. C. C. 341; *Thompson* v. *Phillips*, Bald. 246; *Shrew* v. *Jones*, 2 McL. 78; *Ward* v. *Chamberlain*, 2 Black. 430; *Massingill* v. *Downs*, 7 How. 760; *Byard* v. *Lombard*, 9 How. 530; *United States* v. *Duncan*, 4 McL. 607. And we might cite many other decisions to the same effect in the various states, but deem it unnecessary.

The only case, state or federal, that we have been able to find not in perfect harmony with the settled rule, is that of *Manhattan Co.* v. *Evertson*, 6 Paige's Ch. Pr. 468, decided in 1837, in which Chancellor Wadsworth, much doubting, held that a judgment rendered in one of the dis-

tricts of the State of New York, by the Circuit Court of the United States, was a lien upon the debtor's lands throughout the state. He put it upon the act of May 20, 1826 (4 Stat. at Large, 184), "relative to the issuing of executions in the district and circuit courts of the United States in certain cases." 1 Abb. U. S. Pr. 47. This construction has never before or since been given to that act. It is not necessary to notice the recent act of Congress, adopting the present practice, etc., of the state courts, for it in no manner affects the rule as to judgment liens of the United States courts. The construction we now give to the territorial extent of the liens upon lands of judgments rendered in this court, is the same as that recognized by it from its organization until the decision in General Term, in 1872, in the case of *Goodman* v. *McCall et al.*, 2 Cin. Sup. Ct. Rep. 159. See *Fisher* v. *Murdock*, 1 Handy, 544; *Chatfield* v. *Farran*, 1 Dis. 488; *Butterfield* v. *Ogborn*, 1 Dis. 550.

The only reason why the question was never more definitely decided is, that the well-understood opinions of the judges composing the court, from its formation, would have rendered any attempt to assert such a claim a mere useless one—one that could only end in prompt denial.

It is true, that, had the legislature seen fit to confer upon the court general jurisdiction co-extensive with the county, or to give to its judgments the effect of a lien upon all the debtor's lands in the county, no inconvenience like that of making a judgment in one county a lien upon lands in several, or throughout the state, would have resulted, so far as searching records to ascertain incumbrances upon titles is concerned, for the records would all have been in the clerk's office in the county; but this was not the sole reason for the settled construction given to this subject by the courts. The reason was that a judgment, of its own mere force, should not bind property incidentally in a case where the power to render a judgment against the land directly was denied, if suit should be originally brought for the purpose.

Nor is the reason sufficient, in our judgment, to change this construction, that, if a suit be brought in this court and two of its judges be interested in it, and the third should reserve it upon the law and the facts for decision in General Term, and the General Term should reserve it, as they would be required to do, for decision by the Supreme Court, then the judgment of the Supreme Court would bind all the debtor's lands within Hamilton county. If this be so, it would be no more anomalous than that of a judgment of a removed case in the District Court, whose judgment would be a lien in the county where rendered, and in the county where suit was originally brought, on being entered on the records there. But as all these lien statutes were enacted *before* this court was in existence, the Supreme Court might construe the word " county" in such case " city of Cincinnati," the *territorial area of jurisdiction,* for that is all "county" means in the case of the judgment liens of courts of common pleas. In doing so, no rule of construction would be violated, but, on the contrary, would be following the unbroken current of authority from the beginning of our government and state.

We are therefore constrained to overrule the case of *Goodman* v. *McCall et al.,* 2 Cin. Sup. Ct. Rep. 159. We do so reluctantly, feeling that the judges who then composed this bench were possessed of equal authority with ourselves, and that their opinion is entitled to the same credit, respect, and weight as our own; but we think they erred in the decision of that case, which was no more than we are liable to do in many cases that may come before us. It is to be hoped that a settlement of this question will be sought in the Supreme Court, for, whatever the true rule is, it is one affecting title to real estate in this county—past, present, and future. The attorneys may prepare and submit to us their entries, based upon the decisions we have announced.